**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| ANDREW CHOI, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 4:24-CV-342 |
| | § | APPEAL OF ADVERSARY NO. 22-04031 |
| EDWARD TAN, | § | |
| | § | |
| Appellee. | § | |

### MEMORANDUM AND OPINION

Pending before the court is Appellant Andrew Choi's ("Choi") appeal from a Judgment entered by the bankruptcy court on February 28, 2024, denying Choi's request that the court declare Appellee Edward Tan's ("Tan") debt non-dischargeable under 11 U.S.C. § 523. Having reviewed the record, the submissions of the Appellant, and the applicable law, the court is of the opinion that the bankruptcy court's judgment should be AFFIRMED.

I.    Background

The underlying adversary proceeding arises out of a murky agreement between Choi, Tan, and Brian Ku ("Ku"). At the heart of the parties' convoluted dealings is Boost Mobile, LLP's ("Boost Mobile") select retailer program. Boost Mobile, a subsidiary of the Sprint Pre-Paid Group, has a retailer program that authorizes specific entities to sell Boost Mobile goods and services. Becoming an authorized retailer requires satisfying certain minimum qualifications. Namely, the retailer must live in the area where the stores are located and have at least two years of branded retail management experience. A master dealer has the power to approve Boost Mobile retailers and locations.

An individual named Andy Gupta ("Gupta") owned and operated multiple Boost Mobile stores in the Dallas-Fort Worth area through an entity known as SN Dallas.  A master dealer, Vincent, Huang, & Associates ("VHA"), notified Gupta that his status as an authorized retailer for Boost Mobile had been terminated.  Going forward, VHA intended either to close Gupta's retail locations or transfer them to another authorized retailer.  Sometime in 2017, Ku learned that VHA intended to transfer the retail locations, which marked the inception of his quest to acquire Gupta's stores.  Ku began his pursuit by allegedly searching for potential investors and business partners.  Though it is unclear how Ku and Tan knew each other, at some point, Ku approached Tan with the opportunity to become his partner in this endeavor.

In May 2017, Ku learned from Choi's aunt that Choi might be interested in investing in or purchasing a Boost Mobile store.  Consequently, Ku contacted Choi and represented that he was in a position to sell and convey ownership of one or more Boost Mobile stores.  While Ku and Choi's conversations were ongoing , Ku and Tan formed ETBK Investments, LLC ("ETBK"), on June 6, 2017.  Additionally, Ku and Tan formed Fortune Mobile, LLC ("Fortune Mobile"), on June 12, 2017.

Choi lived in South Korea when Ku first contacted him.  In July 2017, Choi traveled from South Korea to Dallas, Texas, to meet with Ku.  Ku spoke with Choi about the Boost Mobile business and took him to visit three Boost Mobile stores that he claimed Choi would receive in exchange for $400,000.00.  Ku also showed Choi a sales chart for the three stores, demonstrating that the stores generated a total monthly net profit of not less than $30,000.00.

On July 7, 2017, Ku, Tan, and Choi entered into a membership transfer agreement ("First Agreement"), whereby Choi purchased a 99% membership interest in Fortune Mobile from ETBK

in exchange for $400,000.00.  Choi maintains that Ku represented that Fortune Mobile owned the three phone stores he intended to purchase.  Ku and Tan were not personally party to the First Agreement.  Rather, Ku and Tan signed the Agreement on behalf of ETBK.  Choi was represented by counsel, Patrick Lee ("Lee"), at the time he entered into the First Agreement.  The Agreement provides in relevant part:

> **WHEREAS**, ETBK is the record owner and holder of one hundred percent (100%) of the membership interest of Fortune Mobile LLC (the "Company"), a Texas Limited Liability Company;
>
> . . . .
>
> 1. **TRANSFER OF MEMBERSHIP INTEREST.**  On the Effective Date and subject to the terms and conditions of this Agreement, ETBK hereby sells ninety-nine percent (99%) of the membership interest of the Company to Purchaser ("Interest") and subject to the terms and condition set forth in this Agreement, Purchaser hereby purchases the interest for the amount of four hundred thousand dollars and zero cents ($400,000.00) plus the cost of inventory at the Boost Mobile stores located at 10325 Lake June Rd Ste. 580 Dallas, TX; 11501 Elam Rd. Ste. B, Balch Springs, Texas; 10704 Garland Rd, Dallas, TX (Collectively "Stores").
>
> . . . .
>
> 4. **Effect of Transfer.**  Parties acknowledge, understand and agree that upon execution of this Agreement and approval of Purchaser by Boost Mobile and the Master Dealer as further detailed in section 7.15, Purchaser shall be the owner of 99 percent (99%) of the Membership Interest in the Company.
>
> . . . .
>
> 7.15  **Express Conditions on Transfer**.  This transfer of the membership interest of the Company is expressly contingent on Boost Mobile and the Master Dealer for the Stores approving Purchaser to take over the Company's operations.  This transfer is further expressly contingent on obtaining the Landlords' approval for an assignment of leases or sublease for the Stores.

The payment provision of the First Agreement required Choi to pay $380,000.00 within three days of the effective date. Additionally, Choi had to pay the remaining $20,000.00 plus the cost of inventory within three months of that date. Notably, the First Agreement did not purport to sell or convey any interest in the Boost Mobile stores Choi visited. Despite the presence of multiple red flags, Lee did not counsel Choi against entering into the First Agreement. Choi tendered the initial payment of $380,000.00 in mid-July.

On July 13, 2017, Ku forwarded an email from VHA to Choi. The email stated "[t]his email is sent to confirm that ETBK has been approved with the partnership of investors including Andrew Choi, Edward Tan and Brian Ku as authorized dealers with Boost Mobile. We also have reached approval for them to take over the former SN Dallas locations in Garland and Dallas." An agent for VHA, however, maintains that the approval mentioned in the email was preliminary and that ETBK never received final approval. On July 17, 2017, a Certificate of Amendment was filed with the Texas Secretary of State regarding Fortune Mobile. The Certificate of Amendment named Choi and ETBK as Fortune Mobile's managing members and removed Tan and Ku.

On July 26, 2017, Ku submitted an application to VHA to make Fortune Mobile an authorized Boost Mobile retailer. The documentation listed ETBK as the principal owner of Fortune Mobile, despite Choi's owning a 99% membership interest in the company. On August 2, 2017, Fortune Mobile obtained final approval to become a Boost Mobile retailer. Fortune Mobile and VHA executed a retail agreement the same day. On September 14, 2017, Choi entered another agreement ("Second Agreement") with ETBK, whereby he agreed to null and void the First Agreement. The Second Agreement provides:

4

    1.      **Termination of Membership Transfer Agreement**.  The Membership Transfer Agreement executed by and between the Parties on or about July 7, 2017 is hereby null and void.

    2.      **Effective Date of Null & Void of the Membership Transfer Agreement.**  This Agreement to Null and Void the Membership Agreement is effective as of July 25, 2017 ("Effective Date").  All of Choi's interest in the Company shall cease as of the Effective Date for all purposes including but not limited to for tax purposes.

. . . .

    10.      **Release and Discharge of ETBK.**  In reliance upon the representations, warranties, and covenants in this Agreement, and concurrently with the execution and delivery of this Agreement, Choi hereby fully and finally releases and discharge[s] ETBK.

There are many notable aspects of the Second Agreement, not all of which need to be addressed. Nevertheless, of particular significance is the fact that the Second Agreement includes a provision completely releasing ETBK from liability.  Additionally, the Second Agreement's effective date was backdated to make it effective the day before Ku submitted the appropriate paper work to make Fortune Mobile an authorized retailer.

Choi testified in the adversary proceeding that he signed the Second Agreement because Ku and Tan came to his house and told him that he had broken the law by contacting the Sprint Pre-Paid Group.  Thus, Ku and Tan claimed that the First Agreement needed to be replaced. Moreover, Choi contends that Ku and Tan threatened him with criminal consequences when he started asking questions about the Second Agreement.  Tan, however, testified that while he and Ku did visit Choi's home, they did not threaten him.

Ku, Tan, and Choi executed another Membership Transfer Agreement ("Third Agreement") on September 14, 2017, shortly after voiding the First Agreement.[1]  Choi and Fortune Mobile were the only signatories to the Third Agreement.  ETBK signed the agreement on behalf of Fortune Mobile, and Tan and Ku signed on behalf of ETBK.  The Third Agreement closely resembles the First Agreement in that it transfers a 99% ownership interest in Fortune Mobile to Choi in exchange for $400,000.00.  Regarding Choi's payment, however, the Third Agreement provides:

> **1.1** **Payment of Purchase Price.**  Purchaser has paid three hundred eighty thousand dollars and zero cents ($380,000.00).  The remaining twenty thousand dollars ($20,000.00) and the inventory cost shall be paid by October 15, 2017.

The Third Agreement also removes the contingencies contained in Section 7.15 of the First Agreement, changes the division of profits, and reallocates the right to operate the stores. Additionally, the Third Agreement adds a provision prohibiting Choi from contacting the Sprint Pre-Paid Group and VHA.  Notably, the day before executing the Third Agreement, Tan sent an email to Larry Smith ("Smith"), the landlord for one of the stores Choi intended to purchase pursuant to the First and Third Agreements, stating "Andrew Choi was a former partner" and he "no longer [had] any association with [Tan's] group."  Choi paid the remaining balance in October 2017.

On May 25, 2018, Choi filed suit in the 101st Judicial District Court of Dallas County, Texas.  Approximately a year later, Choi filed a traditional motion for partial summary judgment on his claims of fraud, fraudulent inducement, violations of the Texas Securities Act, negligence,

---

[1] The bankruptcy court appears to address the Second and Third Agreements as one document. For clarity, however, the court finds it helpful to distinguish the agreements.

6

and negligent misrepresentation, among other claims.  On January 7, 2020, the court entered an order granting the motion as to liability on the listed claims against ETBK, Tan, Ku, and Patrick Lee.  Tan filed for bankruptcy on March 25, 2022, before the state court could determine Choi's damages at trial.

Tan filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code.  On June 20, 2022, Choi filed the underlying Complaint.  In his Complaint, Choi maintains that four different subsections of 11 U.S.C. § 523(a) provide grounds for declaring Tan's indebtedness to him non-dischargeable.  A trial was conducted in the adversary proceeding on December 4, 2023.  On February 28, 2024, the bankruptcy court conducted a hearing where it rendered its oral findings of fact and conclusions of law.  The bankruptcy court concluded that none of the cited exceptions to discharge applied and ruled in favor of Tan.  On March 13, 2024, Choi filed a Motion to Reconsider, which was denied on April 9, 2024.  Choi filed his Notice of Appeal (#1) on April 19, 2024.  On July 2, 2024, Choi filed his Appellant Brief (#8), raising four issues on appeal.  Tan did not respond or file an Appellee Brief.  Accordingly, the four issues on appeal are:

(1)     whether the bankruptcy court erred in finding that the debt owed by Edward Tan to Andrew Choi was dischargeable under 11 U.S.C. § 523(a)(2)(A);

(2)     whether the bankruptcy court erred in finding that the debt owed by Edward Tan to Andrew Choi was dischargeable under 11 U.S.C. § 523(a)(2)(B);

(3)     whether the bankruptcy court erred in finding that the debt owed by Edward Tan to Andrew Choi was dischargeable under 11 U.S.C. § 523(a)(4); and

(4)     whether the bankruptcy court erred in finding that the debt owed by Edward Tan to Andrew Choi was dischargeable under 11 U.S.C. § 523(a)(6).

II.   Analysis

District courts have jurisdiction to hear appeals from "final judgments, orders, and decrees" and, with leave of the court, "other interlocutory orders and decrees" of bankruptcy judges.  28 U.S.C. § 158(a).  Pursuant to 28 U.S.C. § 158(c)(2), an appeal from the bankruptcy court to the district court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts."  *Id.*  Therefore, "when reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court."[2]  *First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)); *see In re Fieldwood Energy L.L.C.*, 93 F.4th 817, 819 (5th Cir. 2024); *Lowe v. Gammon (In re Champion Print. & Copying, L.L.C.)*, No. 21-51234, 2023 WL 179851, at *3 (5th Cir. Jan. 13, 2023).

When reviewing a decision of the bankruptcy court, the court must accept the bankruptcy court's findings of fact unless clearly erroneous and examine the bankruptcy court's conclusions of law *de novo*.  *Okorie v. Lentz (In re Okorie)*, No. 24-60377, 2025 WL 603890, at *3 (5th Cir. Feb. 25, 2025); *In re J.C. Penny Dir. Mktg. Servs., L.L.C.*, 50 F.4th 532, 533-34 (5th Cir. 2022); *Galaz v. Galaz (In re Galaz)*, 850 F.3d 800, 804 (5th Cir. 2017); *Monge v. Rojas (In re Monge)*, 826 F.3d 250, 254 (5th Cir. 2016).  Mixed questions of law and fact are reviewed *de novo*.  *In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d at 294; *Tech. Lending Partners, LLC v. San Patricio Cnty. Cmty. Action Agency (In re San Patricio Cnty. Cmty. Action Agency)*, 575 F.3d

---

[2] Core proceedings include "determinations as to the dischargeability of particular debts."  28 U.S.C. § 157(b)(2)(K).

553, 557 (5th Cir. 2009). Additionally, "[w]hen a finding of fact is premised on an improper legal standard, or a proper one improperly applied . . . that finding is reviewed *de novo.*" *Sylvester v. Chaffe McCall, L.L.P. (In re Sylvester)*, No. 23-30003, 2023 WL 5814882, at *2 (5th Cir. Sept. 8, 2023); *Stone v. Viegelahn (In re Stone)*, 814 F. App'x 857, 858 (5th Cir. 2020).

A.     Discharge and Exceptions to Discharge

An equitable principle undergirding the Bankruptcy Code is that relief should be afforded to the "honest but unfortunate debtor." *Lamar, Archer & Cofrin, L.L.P. v. Appling*, 584 U.S. 709, 715 (2018). In keeping with that principle, § 727(a) of the Bankruptcy Code discharges a debtor's debts in a Chapter 7 proceeding. 11 U.S.C. § 727(a). A discharge pursuant to § 727(a) discharges an "individual debtor from all debts that arose before the date of the order for relief under Chapter 7." 9D GEORGE L. BLUM, *et. al.*, AM. JUR. 2D BANKRUPTCY § 3520 (Jan. 2025). A bankruptcy discharge does not, however, extinguish the debt. *Banco Popular N. Am. v. Kanning*, 638 F. App'x 328, 342 (5th Cir. 2016); *Moser v. Schachar (In re Thaw)*, 620 F. App'x 304, 307 (5th Cir. 2015). Instead, the discharge prohibits the creditor from collecting the debt. *Banco Popular N. Am.*, 638 F. App'x at 342; *In re Thaw*, 620 F. App'x at 307. Specifically, the discharge operates as an injunction against the commencement or continuation of an action to collect any debt as a personal liability of the debtor. 9D AM. JUR. 2D BANKRUPTCY § 3508 (Jan. 2025). Consequently, a discharge pursuant to § 727 provides the debtor with a "fresh start." *Bartenwerfer v. Buckley*, 598 U.S. 69, 73 (2023).

Congress, however, has set forth various exceptions to the dischargeability of debts. *See, e.g.*, 11 U.S.C. § 523(a). Courts have recognized that exceptions to discharge reflect a legislative determination that, in certain circumstances, the creditor's interest in recovering full payment of

the debt outweighs the debtor's interest in a completely fresh start. *Id.* at 72; *Cohen v. De La Cruz*, 523 U.S. 213, 222 (1998). Section 523(a) excepts certain debts from discharge in Chapter 7, Chapter 11, and Chapter 12 bankruptcy proceedings. *See* 11 U.S.C. § 523(a). Courts must construe § 523(a) strictly against the creditor and liberally in favor of the debtor. *Lawrence v. Frost Bank (In re Lawrence)*, No. 21-10103, 2022 WL 118966, at *1 (5th Cir. Jan. 12, 2022). The creditor bears the burden of proving an exception to discharge. *Sherrick v. HST Co. Interiors, L.L.C.*, No. 18-5695, 2019 WL 3010792, at *2 (6th Cir. Feb. 27, 2019). It is important to note, however, that "'a debtor has no constitutional or fundamental right to a discharge,' and the 'Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.'" *In re Lawrence*, 2022 WL 118966, at *1 (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)).

In the present case, Choi raises four exceptions to discharge under § 523(a). First, Choi asserts that 11 U.S.C. § 523(a)(2)(A) renders Tan's debt non-dischargeable because the debt was obtained by false pretenses or actual fraud. Second, Choi contends that 11 U.S.C. § 523(a)(2)(B) precludes the discharge of Tan's debt because Tan made a written material misrepresentation regarding Fortune Mobile's financial condition with the intent to deceive. Third, Choi claims that Tan's debt is non-dischargeable because 11 U.S.C. § 523(a)(4) prevents the discharge of debts that are acquired by embezzlement or larceny. Lastly, Choi asserts that Tan's debt cannot be discharged because 11 U.S.C. § 523(a)(6) precludes the discharge of a debt that is the result of a willful and malicious injury by the debtor to another person or entity.

B.    <u>Section 523(a)(2)(A)</u>

Choi first contends that the bankruptcy court erred in refusing to declare Tan's debt non-dischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) states in relevant part:

(a)    A discharge . . . does not discharge an individual debtor from any debt— . . .

(2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— . . .

(A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial position.

11 U.S.C. § 523(a)(2)(A); *see also In re Lawrence*, 2022 WL 118966, at *2. The Supreme Court of the United States has recognized that § 523(a)(2)(A) creates, at a minimum, two distinct mechanisms by which a creditor may establish an exception to discharge. *See Husky Int'l Elecs. Inc. v. Ritz*, 578 U.S. 355, 360 (2016); *Field v. Mans*, 516 U.S. 59, 69 (1995). Specifically, a creditor may demonstrate the applicability of § 523(a)(2)(A) by establishing that the debt was obtained either by false pretenses or, alternatively, actual fraud. *Husky Int'l Elecs. Inc.*, 578 U.S. at 366 (noting that a claim of actual fraud or false pretenses will independently satisfy § 523(a)(2)(A)).

Because "false pretenses," and "actual fraud," are common-law terms, courts imbue those terms with their common law meanings. *Id.* at 369. As a result, a creditor must prove the common-law elements of the relevant exception for § 523(a)(2)(A) to apply. *Id.* A common law showing of false pretenses requires the creditor to prove that the debtor's representation was a knowing and fraudulent falsehood that described past or current facts and was relied on by another

11

party. *In re Selenberg*, No. 15-5022, 2016 WL 3034165, at *2 (E.D. La. May 27, 2016) (citing *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)); *see City Ctr. Wichita Falls, L.L.C. v. Harwell (In re Harwell)*, No. 22-51321-mmp, 2024 WL 332876, at *2 (Bankr. W.D. Tex. Jan. 26, 2024). A common law showing of actual fraud, however, requires the creditor to demonstrate that:

(1)    the debtor made representations;

(2)    he knew the representations were false when he made them;

(3)    he made the representations with the intention and purpose to deceive the creditor;

(4)    the creditor relied on the representations; and

(5)    the creditor sustained loss as a proximate result of the representations.

*Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017). Whether pursuing false pretenses or actual fraud, the creditor must establish each of the elements of his common law cause of action by a preponderance of the evidence. *See Grogan*, 498 U.S. at 286.

### 1.    State Court Determination of Fraud

Before reviewing Choi's claim under § 523(a)(2)(A), the court must address the state court determination of liability. As noted above, the 101st District Court of Dallas County, Texas, granted Choi's motion for summary judgment on his claims for fraud against Tan before Tan filed for bankruptcy. Choi does not contend on appeal that the state court's determination of fraud is dispositive in the present case. Nevertheless, the striking similarity between Choi's state law claims and his claims under § 523(a)(2)(A) warrants discussion.

The existence of a prior determination of liability raises the issue of whether the doctrine of collateral estoppel should apply. "The Supreme Court has explicitly stated that collateral

estoppel, or issue preclusion, principles apply in bankruptcy dischargeability proceedings." *Clem v. Tomlinson (In re Clem)*, 124 F.4th 341, 348-49 (5th Cir. 2024) (citing *Grogan*, 498 U.S. at 285 n.11). Consequently, a pre-petition fraud judgment will establish the applicability of § 523(a)(2)(A) if the principles of collateral estoppel are satisfied. *See id.* (recognizing that Texas common law fraud has been recognized as having preclusive effect under § 523(a)(2)(A)).

The determination of the effect that should be given to a prior judgment is governed by the law of the state that rendered the prior judgment. *Happy Hollow Ranch, L.P. v. Howley (In re Howley)*, No. 23-31029-sgj7, Adv. No. 23-03068-sgj, 2024 WL 409126, at *7 (Bankr. N.D. Tex. Feb. 2, 2024); *see Dare v. Jenkins (In re Jenkins)*, 607 B.R. 270, 283-84 (Bankr. N.D. Tex. 2019). Thus, Texas law determines the preclusive effect that must be given to the state court's determination of fraud. *Dare*, 607 B.R. at 283-84. Texas law requires the party seeking to establish collateral estoppel to prove:

1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action;

2) those facts were essential to the judgment in the first action; and

3) the parties were cast as adversaries in the first action.

*Clem*, 124 F.4th at 348. Additionally, the party asserting issue preclusion bears the burden of proof. *Id.* Therefore, the proponent of the doctrine also bears the burden of bringing forward an adequate state-court record. *Id.* (citing *In re King*, 103 F.3d 17, 19 (5th Cir. 1997)).

Choi did not explicitly raise the issue of collateral estoppel in the proceedings before the bankruptcy court and, even if he did, he failed to raise the issue on appeal. A court sitting in appellate jurisdiction may, however, raise collateral estoppel *sua sponte* in a very narrow set of circumstances. *OneBeacon Am. Ins. Co. v. Barnett*, 761 F. App'x 396, 399 (5th Cir. 2019). The

United States Court of Appeals for the Fifth Circuit has recognized two instances in which a *sua sponte* consideration of collateral estoppel is permissible. *Id.* First, a court may raise issue preclusion when both actions were brought in courts of the same district. *Id.* Alternatively, a court may raise the issue when all of the relevant facts are contained in the record and uncontroverted. *Id.* (citing *Mowbray v. Cameron County*, 274 F.3d 269, 281 (5th Cir. 2001)). The Fifth Circuit, however, has cautioned that such action should rarely be taken "for it is a 'drastic step' to 'invok[e] res judicata for the first time on appeal and revers[e] the [trial court] below as a consequence.'" *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 874 (5th Cir. 2024) (quoting *United Home Rentals, Inc. v. Tex. Real Est. Comm'n*, 716 F.2d 324, 330 (5th Cir. 1983)).

In the present case, the court cannot raise issue preclusion *sua sponte* because it is unclear whether all of the facts from the state court proceeding are contained in the record, and the prior action was not brought in the same district. At trial, Choi offered a copy of his motion for summary judgment as an exhibit as well as the state court order granting the motion. The order, however, simply reflects the ultimate conclusion that was reached during a hearing before the state court judge. The order does not contain any factual conclusions, analysis, or reasoning, and the record on appeal does not include a transcript of the hearing, where such reasoning might be found. Accordingly, the record is unclear as to which facts the state court judge relied upon to conclude that Tan committed fraud.

Additionally, Tan chose not to file an Appellee brief in the present action. Tan's decision to forego filing a brief has made it extremely difficult to determine which facts exactly Tan contested and controverted in state court or before the bankruptcy court. In light of the vague and

14

ambiguous nature of the record, the court cannot justify taking the "drastic step" of applying collateral estoppel *sua sponte*.  *R.J. Reynolds Tobacco Co.*, 96 F.4th at 874.  Having concluded that collateral estoppel should not be applied, the court must evaluate the merits of Choi's requested declaration under § 523(a)(2)(A).

2.    <u>False Pretenses, False Representations, or Fraud</u>

Actual fraud and false pretenses share a common element requiring the creditor to demonstrate that the debtor made a knowingly false representation.  *In re Harwell*, 2024 WL 332876, at *2; *In re Selenberg*, 856 F.3d at 398.  Choi identifies two representations on appeal that he contends satisfy the above criteria.  First, Choi maintains that Tan's debt to him arose out of the representation that Fortune Mobile owned three phone stores in the Dallas-Fort Worth area.  Second, Choi asserts that Tan's debt to him arose from the representation that the three stores generated a net monthly profit of not less than $30,000.00.

A preliminary issue, however, is whether Tan personally made the alleged representations. The bankruptcy court concluded that Ku, not Tan, made any and all relevant misrepresentations. The bankruptcy court's conclusion is factual in nature and subject to clear error review.  "A finding of fact is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony."  *First Baptist Church of Iowa, La. v. Church Mu. Ins. Co., S.I.*, 105 F.4th 775, 785 (5th Cir. 2024).  Additionally, "[a] finding of fact is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Sneed v. Austin Indep. Sch. Dist.*, 50 F.4th 483,

489 (5th Cir. 2022). Alternatively, a factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. *United States v. Harris*, 84 F.4th 596, 599 (5th Cir. 2023).

Choi notes in his Appellant Brief that the "undisputed evidence shows that both [Tan] and Ku made the relevant statements." Choi cites supporting documents regarding who made the alleged misrepresentations in the background section of his brief. The citations, however, are less than helpful as they merely reference the bankruptcy court's findings of fact, Choi's Complaint, and Choi's Motion for Reconsideration. Furthermore, only Choi's Motion for Reconsideration cites evidence offered in the proceedings before the bankruptcy court. Notably, however, Choi's Motion for Reconsideration does not cite any evidence suggesting that Tan made the alleged representations. Moreover, an independent review of the record demonstrates that the only evidentiary support for Choi's contention is Choi's own testimony. The bankruptcy court, however, heard live testimony from Tan that controverted Choi's testimony. The transcript of Tan's testimony is not available on appeal. Consequently, the court cannot conclude that the bankruptcy court committed clear error when the court was in a superior position to evaluate the credibility of Tan's testimony and the evidence contradicting the court's conclusion is negligible. Therefore, the bankruptcy court's undisturbed findings of fact establish that Choi dealt primarily with Ku and that Ku made the representations at issue in the present case.

Choi seemingly anticipated the above result and maintains, in the alternative, that Ku's misrepresentations can be attributed to Tan for purposes of § 523(a)(2)(A). As Choi notes in his Appellant Brief, the Fifth Circuit recently recognized that § 523(a)(2)(A) can extend to liability for fraud that a debtor did not personally commit. *Kahkeshani v. Hann (In re Hann)*, No. 22-20407, 2023 WL 6803541, at *6 (5th Cir. Oct. 16, 2023). The Fifth Circuit reasoned that the

16

passive language in § 523(a)(2)(A) indicates that the applicability of the section turns on "how the money was obtained, not who committed fraud to obtain it." *Id.* (citing *Bartenwerfer*, 489 U.S. at 72). Thus, Choi maintains that *Hann* stands for the proposition that a debtor may be liable for fraud he did not personally commit.

Choi's interpretation of *Hann* omits a key component of the court's holding. The Fifth Circuit in *Hann* did not unconditionally conclude that a debtor may *always* be held liable for fraud he did not personally commit. *Id.* Rather, the court held that state law determines when a person can be liable for the fraud of another under § 523(a)(2)(A). *Id.* ("The Court also clarified that '§ 523(a)(2)(A) does not define the scope of one person's liability for another's fraud' . . . [r]ather 'that is the function of the underlying law,' which in *Bartenwerfer*, was the law of California." (quoting *Bartenwerfer*, 489 U.S. 81-82)). Consequently, the Fifth Circuit applied Texas law to determine the liability of the debtor for the representations of another. *Id.*

Here, Texas law determines the scope of Tan's liability to Choi for Ku's misrepresentations.[3] Tan's purported debt to Choi arises from the First Agreement, because Choi relied on Ku's representations in entering the First Agreement and the Agreement reflects Choi's initial decision to purchase Fortune Mobile.[4] Furthermore, Choi paid a majority of the purchase price, $380,000.00, pursuant to the First Agreement before it was voided. Therefore, the court must evaluate whether Texas law recognizes Tan's liability for Ku's misrepresentations under the First Agreement.

---

[3] ETBK is a Texas limited liability company.

[4] Choi only discusses the impact of Ku's misrepresentations on his initial decision to purchase an interest in Fortune Mobile, which occurred when he signed the First Agreement. By the time Choi signed the Third Agreement, his decision had been reached three months prior and he was simply re-executing a slightly altered version of the First Agreement.

Choi and ETBK are the only signatories to the First Agreement. As a result, the issue is whether Tan can be held personally liable for the misrepresentations Ku made on behalf of ETBK. Generally, a member of a Limited Liability Company ("LLC") is not personally liable for the debts, obligations, and liabilities of the company. *See WC 4th & Colo., L.P. v. Colo. Third St., L.L.C.*, No. 03-22-00781-CV, 2024 WL 3841676, at *6 (Tex. App.—Austin Aug. 15, 2024, pet. filed); *Deaton v. Moreno*, No. 02–16–00188–CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied). While a member of an LLC is personally liable for torts he commits while acting on behalf of the LLC, that liability generally does not extend to the torts of another member. *See Deaton*, 2017 WL 4683940, at *5.

There is, however, a very narrow exception by which an owner of a beneficial interest in an LLC may be held personally liable for the actions of another member. TEX. BUS. ORG. CODE § 21.223(b); *Plan B Holdings, L.L.C. v. R.S.L.L.P.*, 681 S.W.3d 443, 458 (Tex. App.—Austin 2023, no pet.) (recognizing that § 21.223(b) applies to LLCs as well as corporations). Section 21.223(b) provides that a beneficial owner may be held liable for the fraud perpetrated by another member on behalf of the LLC if the beneficial owner "caused the [LLC] to be used for the purpose of perpetrating and [the LLC] did perpetrate an actual fraud on the [creditor] primarily for the direct personal benefit of the . . . beneficial owner." TEX. BUS. ORG. CODE § 21.223(b). Therefore, Choi must establish the applicability of § 21.223(b) for Tan to be personally liable for Ku's misrepresentations under § 523(a)(2)(A).

Choi has failed to cite any evidence demonstrating that Tan caused ETBK to be used to perpetrate a fraud. The bankruptcy court's findings of fact and conclusions of law reflect that Ku was the driving force behind Choi's dealings with ETBK. As factual support, the bankruptcy

18

court highlights that a majority of the conversations between Choi and Ku were in Korean, a language in which Tan was not as fluent. Additionally, Tan testified that he was present only to "do the signing." Moreover, Tan, like Choi, had no prior experience in the retail phone industry. Ku, however, had years of experience. Accordingly, the record suggests that Tan was a relatively passive participant who may not have been aware of Ku's false representations. Therefore, the court cannot conclude that Tan "caused" ETBK to be used to perpetrate a fraud.

Choi has also failed to demonstrate that Tan received a "direct personal benefit" on account of the purported fraud perpetrated by ETBK. Choi ultimately paid $400,000.00 to ETBK during the course of the parties' dealings. The only evidence in the record regarding whether Tan received a direct personal benefit is his testimony wherein he stated that he "was never paid any money by ETBK."[5] On the record, Tan's testimony is unrefuted and remains so. Because the record indicates that Tan never received any funds from Choi or profited from Choi's investment in ETBK, it cannot be said that Tan directly and personally benefited from the alleged fraud perpetrated by ETBK. Therefore, Tan is not personally liable under § 21.223(b) for Ku's misrepresentations on behalf of ETBK.

Based on the foregoing analysis, § 21.223(b) does not apply. Because state law does not recognize Tan's liability for Ku's misrepresentations, the applicability of § 523(a)(2)(A) cannot be predicated on those statements. Moreover, Choi does not advance any other statements which he contends on appeal warrant the application of the fraud exception to discharge. Therefore, the bankruptcy court correctly concluded that § 523(a)(2)(A) does not apply.

---

[5] This testimony is reflected in the bankruptcy court's findings of fact and conclusions of law.

19

C.     Section 523(a)(2)(B)

Choi also maintains that the bankruptcy court erred in refusing to declare Tan's debt non-dischargeable under § 523(a)(2)(B) of the Bankruptcy Code.  Section 523(a)(2)(B) states in relevant part:

> (a)     A discharge . . . does not discharge an individual debtor from any debt— . . .
>
> > (2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— . . .
> >
> > > (B)     use of a statement *in writing* –
> > >
> > > > (i)     that is materially false;
> > > >
> > > > (ii)     respecting the debtor's or an insider's financial condition;
> > > >
> > > > (iii)     on which the creditor to whom the debtor is liable for such money property services or credit reasonably relied; and
> > > >
> > > > (iv)     that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2)(B) (emphasis added); *see also Elliott v. Piazza, III (In re Piazza)*, No. 23-3061, 2024 WL 4973301, at *4 (3d Cir. Dec. 4, 2024); *Veritex Comm'n Bank v. Osborne (In re Osborne)*, 951 F.3d 691, 696 (5th Cir. 2020).  Again, the creditor bears the burden of proving an exception to discharge.  *Sherrick*, 2019 WL 3010792, at *2.  Therefore, Choi must have demonstrated each of the above elements by a preponderance of the evidence to be entitled to the application of the exception.

Here, Choi identifies two written statements that he contends satisfy the criteria contained in § 523(a)(2)(B).  First, Choi highlights the First Agreement which he maintains represented that

Fortune Mobile owned three mobile phone stores. Second, Choi points out a series of sales charts, which indicated that the stores produced a monthly net profit of not less than $30,000.00.

There exists, however, a glaring oversight with Choi's contention regarding the First Agreement. Namely, the First Agreement never represents that Fortune Mobile owns any Boost Mobile stores. The court acknowledges that certain provisions of the First Agreement suggest that Fortune Mobile owned at least three cell phone stores. This is evidenced by the fact that Section 1 of the Agreement requires Choi to purchase the inventory from the Boost Mobile stores located at three specific addresses. Additionally, Section 7.15 predicates the transfer of ETBK's membership interest in Fortune Mobile to Choi on receiving approval to take over Fortune Mobile's operations, which implies that such operations are already ongoing. Nevertheless, the First Agreement never crosses the line by explicitly stating or representing that Fortune Mobile owns any Boost Mobile stores. Similarly, the First Agreement never states that Choi purchased an ownership interest in three Boost Mobile stores. Therefore, the First Agreement cannot serve as a statement in writing for purposes of § 523(a)(2)(B) because the Agreement does not contain the alleged misrepresentation.

The sales charts present a slightly different issue. The bankruptcy court found that the sales charts existed and was presented to Choi before entering the First Agreement. The bankruptcy court's findings of fact, however, associate the sales charts solely with Ku. Specifically, the court concluded that "Ku . . . showed plaintiff sales information charts for these stores which appeared to demonstrate that the stores generated a total monthly net profit of not less than $30,000.00." Hence, a similar problem arises regarding whether the representations contained within the sales charts can be attributed to Tan.

Again, the only evidence in the record indicating that Tan made a representation regarding the monthly net profit of the three Boost Mobile stores is Choi's testimony. That testimony is controverted by Tan's testimony, wherein he indicated that he was not present when Ku showed Choi the sales charts. The bankruptcy court heard Tan's testimony live and is better situated to evaluate Tan's credibility. *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of the witnesses."). After receiving Tan's testimony, the bankruptcy court concluded that Ku, not Tan, presented the sales charts and represented that the stores generated a monthly net profit of not less than $30,000.00. Accordingly, the bankruptcy court did not commit clear error by concluding that Tan did not make the representations contained in the sales charts. Because the bankruptcy court's undisturbed findings of fact establish that Tan did not make any written misrepresentations, the bankruptcy court correctly concluded that § 523(a)(2)(B) does not apply in the present case.

D.    Section 523(a)(4)

Choi's third point of error asserts that the bankruptcy court incorrectly concluded that the exception to discharge contained in § 523(a)(4) of the Bankruptcy Code does not apply to Tan's debt. Section 523(a)(4) provides:

(a)    A discharge . . . does not discharge an individual debtor from any debt— . . .

(4)    for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

11 U.S.C § 523(a)(4); *Kahkeshani*, 2023 WL 6803541, at *3; *see Tico Constr. Co., Inc. v. Powell (In re Powell)*, 119 F.4th 597, 601 (9th Cir. 2024); *Botelho v. Buscone (In re Buscone)*,

61 F.4th 10, 17 (1st Cir. 2023).  Choi does not maintain that Tan committed fraud or defalcation while acting in a fiduciary capacity.  Rather, Choi avers that the bankruptcy court should have concluded that Tan's debt is non-dischargeable because it is the result of embezzlement or larceny.

Generally, larceny and embezzlement are mutually exclusive.  This is a consequence of the fact that larceny requires the initial taking of the property to be unlawful, while embezzlement requires the property to be initially entrusted to another and subsequently appropriated.  GEORGE BLUM, 9D AM. JUR. 2D BANKRUPTCY § 3583 (Jan. 2025); *Ketelhut v. Allen (In re Allen)*, No. 22-20178-rlj7, Adv. No. 22-02005, 2025 WL 319925, at *15 (Bankr. N.D. Tex. Jan. 28, 2025); *Chowdary v. Ozcelebi (In re Ozcelebi)*, 640 B.R. 884, 903 n.116 (S.D. Tex. 2022).  Here, Choi willingly entrusted the funds to ETBK, thereby making the initial taking lawful.  *See In re Allen*, 2025 WL 319925, at *15.  Therefore, § 523(a)(4) will apply only if Choi can establish that Tan's debt arises from embezzlement.

For purposes of § 523(a)(4), embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *Savage v. Port Louis Owners Ass'n, Inc. (In re Savage)*, 333 F. App'x 831, 835 (5th Cir. 2009); *see Camp Inn Lodge, L.L.C. v. Kirvan (In re Kirvan)*, No. 21-1250, 2021 WL 4963363, at *2 (6th Cir. Oct. 26, 2021).  A creditor proves embezzlement when he establishes that he:

    (1)     entrusted his property to the debtor;

    (2)     the debtor appropriated the property for a use other than that for which it was entrusted; and

    (3)     the circumstances indicate fraud.

*Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998); *PACAAR Fin. Co. v. Dhaliwal*, 630 B.R. 24, 31 (Bankr. S.D. Tex. 2021); *see Toxpro Labs. v. Rosenburg (In re Rosenburg)*, No. 20-40753-mxm-7, Adv. No. 20-04046-mxm, 2022 WL 4085886, at *6 (Bankr. N.D. Tex. Sep. 6, 2022).

Additionally, the creditor must demonstrate that the debtor acted with fraudulent intent in taking the money. *In re Savage*, 333 F. App'x at 835. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witness and the weight to be given to their testimony." *In re Arnett*e, 454 B.R. 663, 683 (Bankr. N.D. Tex. 2011); *see* ELEANOR GROSSMAN, *et al.*, 37 AM. JUR. 2D FRAUD AND DECEIT § 113 (2d ed. 2025). Accordingly, the bankruptcy court's determination regarding Tan's intent must be clearly erroneous for it to be overturned on appeal.

Choi summarily states that "[t]he fraud element is shown for the same reasons as briefed above." As noted above, Choi's contentions regarding fraud are unpersuasive. Choi's prior contentions are solely that Tan misrepresented that Fortune Mobile owned three Boost Mobile stores and that the stores generated a monthly net profit of not less than $30,000.00. The court, however, has already affirmed the bankruptcy court's conclusion that Ku made the relevant misrepresentations, and Ku's misrepresentations are not probative of Tan's intent.

Furthermore, the record supports the bankruptcy court's conclusion that Tan did not enter the First Agreement with fraudulent intent. As noted above, Choi dealt primarily with Ku. Ku's intent in entering the First Agreement is, at a minimum, suspect. If the inquiry regarded whether Ku acted with fraudulent intent, the outcome would likely be different, as the record suggests that Ku made multiple false statements, stretched the truth, and took advantage of Choi's

misunderstanding of the First Agreement. Ku's intent, however, bears little on whether Tan acted with fraudulent intent. At most, one could contend that Ku's questionable actions are probative of Tan's intent because Tan chose to associate with Ku. Nevertheless, the record reflects an alternative, plausible possibility—that Tan was unaware of Ku's misrepresentations and mal intent. As discussed above, Tan was absent for most of the parties' dealings prior to signing the First Agreement. Additionally, when Tan was present, many of the conversations between Ku and Choi were in Korean, a language in which Tan lacked comparable proficiency. Therefore, a review of Tan's actions and involvement before signing the First Agreement support the bankruptcy court's conclusion that Tan did not act with fraudulent intent.

A secondary concern arises, however, with respect to whether Tan's subsequent actions reflect fraudulent intent.[6] There is some evidence in the record suggesting that Tan's intent may have changed somewhat between the execution of the First Agreement and the Third Agreement. Specifically, Tan may have become aware of and agreed to participate, at least in part, in Ku's fraudulent scheme. This is evidenced by the email Tan sent to Smith, the landlord of one of the three Boost Mobile stores mentioned in the First and Third Agreements, the day before executing the Third Agreement. In the email, Tan states that Choi was a former partner and has no association with Tan's group.

The court acknowledges that the email is suspicious. The issue, however, is whether the email is sufficient to show that the bankruptcy court committed clear error in concluding that Tan did not act with fraudulent intent. To the extent Tan's email reflects a fraudulent intent, it bears

---

[6] The court notes that Choi did not raise this issue on appeal, nor did he highlight or discuss the suspect nature of the Third Agreement. Thus, the court reviews this issue on its own accord.

primarily on his intent in entering the Third Agreement in September 2017. The email is not necessarily reflective of Tan's intent three months before when he entered the First Agreement, pursuant to which Choi relinquished a majority of his funds. Consequently, the email does not evince Tan's intent when Choi entrusted $380,000.00 to ETBK.

Furthermore, the court does not view the email as inherently fraudulent. There are various reasons Tan might have wanted to downplay Choi's involvement when speaking to Smith, some of which do not require Tan to harbor fraudulent intent toward Choi. For example, pursuant to the Third Agreement, ETBK agreed to sub-lease the store locations to Choi until the leases expired. At the time the Third Agreement was signed, however, it appears ETBK was still in the process of acquiring the leases. Accordingly, Tan's email may simply reflect Tan's reluctance to explain the parties' convoluted relationship when ETBK, an entity with whom Choi is not associated, would be taking over the lease of Smith's property. Therefore, the court cannot conclude that the bankruptcy court committed clear error in holding that Tan acted without fraudulent intent.

Moreover, even assuming *arguendo* that Tan had fraudulent intent, Choi cannot demonstrate that he entrusted his money to Tan or that Tan personally appropriated Choi's money for an improper purpose. Rather, the record indicates that Choi entrusted the money to ETBK and that Tan never received or benefited from Choi's investment. In the adversary proceeding, Choi testified that "Ku asked [Choi] to go ahead and wire the funds to him" and that he was advised by ETBK's attorney, Sul Lee, that he could "pay the money directly to ETBK." Choi further testified that he "met with Brian Ku and expressed [his] concerns" about transferring the money directly to ETBK when the contingencies of the First Agreement had not yet been satisfied. Choi

explained that he wired the funds to ETBK in mid-July only after receiving an email indicating that he had been approved to become an authorized Boost Mobile retailer. Additionally, the record contains a copy of a cashier's check that was used to pay Choi's remaining balance pursuant to the Third Agreement, which was made payable to ETBK.[7]

Accordingly, the record reflects that Choi did not entrust his money to Tan and that Tan was not involved in the transfer of funds between Choi and ETBK. Instead, Choi dealt primarily with Ku when he transferred and entrusted the funds to ETBK. Furthermore, there is no evidence that Tan personally appropriated Choi's funds, as Tan testified that he never received any money from ETBK. Therefore, the court cannot conclude that the bankruptcy court erred in refusing to apply the exception to discharge contained in § 523(a)(4).

E.    Section 523(a)(6)

Choi's final point of error avers that the bankruptcy court erred in refusing to declare Tan's debt non-dischargeable pursuant to § 523(a)(6) of the Bankruptcy Code. Section § 523(a)(6) provides:

(a)    A discharge . . . does not discharge an individual debtor from any debt— . . .

(6)    for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C. § 523(a)(6); *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204, 221-22 (2024); *Krueger v. Torres (In re Krueger)*, 812 F.3d 365, 368 (5th Cir. 2016). Section 523(a)(6) applies when the debtor acted with either (1) an objective substantial certainty of harm or (2) a subjective

---

[7] (Ex. 18, Cashiers Check).

motive to cause harm.  *SE Prop. Holdings, L.L.C. v. Green (In re Green)*, 968 F.3d 516, 522 n.14 (5th Cir. 2020).

Here, Choi has failed to demonstrate that Tan held the requisite objective or subjective intent.  Choi cursorily states that he met his burden of showing that Tan acted with both objective and subjective malicious intent because he proved that Tan "made multiple lies about the LLC and value of its equity interest (e.g. that the LLC owned three stores and they were making $30,000.00 per month in profit)."  As noted above, however, the bankruptcy court concluded that Ku made the representations at issue, and Choi has failed to demonstrate that the bankruptcy court's conclusion was clearly erroneous.  Therefore, Choi's contention fails.

Additionally, the undisturbed findings of fact do not establish that Tan acted with willful or malicious intent.  As discussed above, the record suggests that Tan was largely detached from Choi's dealings with ETBK and that he relied on Ku's superior knowledge of the phone industry in entering the First Agreement.  Furthermore, the attenuated evidence in the record suggesting that Tan's intent may have evolved during the course of performance does not establish that the debt was initially incurred as the result of willful or malicious intent.[8]  Therefore, the bankruptcy court did not err in finding that Tan did not intend, objectively or subjectively, to injure Choi.

III.    Conclusion

Based on the foregoing analysis, the court is of the opinion that the judgment of the bankruptcy court should be AFFIRMED.

---

[8] Again, Tan's debt arose when Choi first agreed to purchase Fortune Mobile in exchange for $400,000.00 under the First Agreement.  Moreover, Choi does not contend on appeal that the re-execution of the Third Agreement impacts the court's dischargeability analysis in any way or that it evinces Tan's malicious intent.

SIGNED at Beaumont, Texas, this 27th day of March, 2025.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE